[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 21-10017

————————————————

CYNTHIA DIANE YELLING,

Plaintiff-Appellant,

*versus*

ST. VINCENT'S HEALTH SYSTEM,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:17-cv-01607-SGC

————————————————

Before BRANCH and BRASHER, Circuit Judges, and WINSOR,* District Judge.

PER CURIAM:

Cynthia Yelling worked as a hospital nurse for St. Vincent's Health System. After St. Vincent's fired her, Yelling sued, alleging race discrimination (including hostile work environment) and retaliation under Title VII and 42 U.S.C. § 1981. The district court granted summary judgment for St. Vincent's,[1] and Yelling appealed.

On appeal, Yelling contends she presented sufficient evidence to survive summary judgment as to all claims. She also contends that after *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), it is not appropriate to apply the *McDonnell Douglas* framework to a "mixed-motive" retaliation claim. After careful review, and with the benefit of oral argument, we conclude that (i) Yelling's hostile work environment claim fails because there is no evidence of severe or pervasive harassment; (ii) *Bostock* did nothing to undermine application of *McDonnell Douglas* to retaliation claims because but-for causation still applies; (iii) Yelling's retaliation claim cannot survive—either under *McDonnell Douglas* or otherwise; and (iv)

---

* Honorable Allen Winsor, United States District Judge for the Northern District of Florida, sitting by designation.

[1] With the parties' consent, a magistrate judge presided over the case and issued the order on appeal. *See* 28 U.S.C. § 636(c).

Yelling's disparate-treatment claim fails because there is no evidence that race played a role in her termination. We therefore affirm.

## I.

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (citing *Battle v. Bd. of Regents for the State of Ga.*, 468 F.3d 755, 759 (11th Cir. 2006)). "Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

Because we resolve all factual disputes in the nonmovant's favor, the "'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000). What follows are the facts as accepted for summary judgment purposes.

## II.

In 2010, Yelling began work as a pool nurse in St. Vincent's Birmingham hospital. Pool nurses were not permanently assigned to any hospital unit; instead, they worked throughout the hospital as needed. Yelling later secured a permanent registered nurse assignment in St. Vincent's Clinical Decision Unit ("CDU"). The CDU cared for patients who needed general observation, lab work, or other tests.

Yelling initially worked weekday shifts in the CDU, but she switched to weekend shifts in 2013. Her supervisors—charge nurse Casi Dubose and the patient care supervisor—sometimes had her work extra shifts during the week. Yelling would also volunteer to serve as a relief charge nurse when the CDU needed one. Dubose usually selected white pool nurses for those assignments, but she did choose Yelling—who is black—a few times.

During these first few years, things went smoothly. Dubose evaluated Yelling's job performance and reported that Yelling generally met expectations. But the employment relationship began to sour in 2015.

In March of that year, President Obama visited Lawson State Community College—a predominantly black school Yelling had attended. While nurses were chatting one day at the nurse station, charge nurse Jimmy Wilhite remarked, "What is he doing coming here? Is he handing out food stamps?"

After that, as Yelling explains, the CDU "got really kind of heated with . . . racially disparaging comments." Yelling overheard white pool nurse Sandy Sheffield say, "Michelle Obama looks like a monkey" and that the "President is a piece of shit." White staffer Tiffany Hardy made similar remarks. So too did white weekday nurse Linda Powell, who said President Obama was "stupid," was the "worst president ever," and "needs to go back to Africa."

Yelling also heard these three coworkers refer to black patients as "boy" or "girl," "crack heads," "welfare queens," or "ghetto fabulous." And three other white coworkers—Tonya

Larimore, Robin Calvert, and Jennifer Laroe—talked at the nurse station about their "redneck status," owning guns, and being "confederate flag flyers."

Yelling does not remember having any racial insult or slur directed at her personally. Still, Yelling reported the comments as offensive to the house supervisor on June 14, 2015. She also complained that Dubose maintained a "quota" of only staffing one black nurse per shift. St. Vincent's did not investigate Yelling's complaints or discipline any CDU staff for racist comments or staffing practices.

The weekend after Yelling complained, three coworkers reported that she left the CDU without explanation, acted lethargic and unsteady upon returning, and then fell asleep at the nurse station. When Dubose learned of Yelling's reported behavior that same day, she ordered the house supervisor to suspend Yelling pending a drug test. Yelling's suspension lasted only through the next weekend. The drug test came back negative, and St. Vincent's paid Yelling for the time she was suspended.

Before Yelling returned from her suspension, Dubose reached out to other CDU employees. She told each one about expected employee behavior, asked them to document any future issues with other staff, and emphasized the importance of wearing trackers. (St. Vincent's required CDU nurses to wear devices that tracked their physical locations throughout each day.)

CDU employees began reporting Yelling for not following doctors' patient-care orders and not respecting patients' personal

boundaries. They specifically reported that Yelling disconnected a patient's IV, made that patient uncomfortable by praying with her in an unwanted way, delayed another patient's blood transfusion, and did not properly administer another's antibiotic. Citing this conduct, St. Vincent's placed Yelling in step one of its four-step disciplinary program by giving her a "coaching agreement" in October 2015. The coaching agreement outlined St. Vincent's expectations of Yelling, but it did not carry with it any suspension or loss of pay.

On November 22, 2015, Yelling accused her coworkers of stealing lab orders she printed. Yelling and Calvert got into a heated argument over the accusation, and Yelling shouted that the act of stealing the lab slips was "wicked." She warned that the act would "curse" the perpetrator's children, their children's children, and so on. Dubose learned of the incident and ordered the house supervisor to send Yelling home for the rest of the day. Calvert was not suspended.

When Yelling returned to work the next day, she met with Dubose and three other supervisors. Yelling complained that personnel issues with non-white CDU staff were "dealt with differently" than those with white staff. She filed an EEOC charge that same day, alleging race discrimination, hostile work environment, and other types of discrimination not at issue in this case (age, sex, religion, disability).

On November 24, and despite Yelling's complaints, St. Vincent's moved Yelling to step two of its disciplinary process by

giving her a "verbal agreement." The verbal agreement cited Yelling's outburst toward her coworkers regarding the lab slips. By signing it, Yelling agreed to communicate more appropriately with her coworkers and not call them names. But the verbal agreement, like the coaching agreement, did not require any suspension or loss of pay.

Friction between Yelling and her coworkers continued. On January 10, 2016, Yelling had another heated argument with a nurse. It began while Yelling was at the nurse station talking to the son of a patient in Room 610. The other nurse approached and accused Yelling of not taking care of the Room 610 patient, forcing that nurse to step in and do Yelling's job. (The patient was assigned to Yelling.) Yelling filed a workplace violence complaint against the nurse over the incident, although it involved no violence.

When investigating her complaint, Yelling's supervisors checked her tracking report. The report showed that Yelling did not enter Room 610 any time after 4:01 p.m. Yelling, though, had written on the patient's chart that she observed the patient between 7 and 8 p.m. Six CDU employees separately reported that they saw Yelling at the nurse station after 4:01 p.m., but not in Room 610.

In February 2016, Yelling met with Dubose, another supervisor (who was black), and a human-resources representative to discuss the investigation. These supervisors told Yelling about the tracking report, about its inconsistency with her written reports, and about their belief that she falsified the patient's record. And

citing the alleged falsification, they fired Yelling effective immediately. Yelling professed her innocence, telling them that her tracker did not always work, which she said she had told them before. But Dubose and her colleagues stuck with their decision to fire Yelling.

Although Yelling had not progressed through all four steps of St. Vincent's disciplinary process, her supervisors told her falsifying patient records prompts automatic termination. Before February 2016, white CDU staffers Felicia Parrish, Michael Pike, and Powell had failed to document making patient rounds or did so inaccurately. St. Vincent's disciplined these employees but did not immediately fire them.

St. Vincent's later replaced Yelling with a white nurse, and this suit followed.

## III.

As noted above, Yelling alleged discrimination and retaliation under Title VII and § 1981. Her discrimination claims included separate claims for hostile work environment and disparate treatment. We address each claim in turn.

### A.

To succeed on a racially hostile work environment claim under Title VII or § 1981, Yelling must prove: (1) she belongs to a protected class, (2) she experienced unwelcome harassment, (3) the harassment was based on her race, (4) the harassment was sufficiently severe or pervasive to alter the terms of her employment, and (5) employer responsibility under a theory of vicarious or

direct liability. *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1283 n.3, 1284 (11th Cir. 2018) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

Yelling has certainly provided evidence from which a jury could find she satisfied the first two elements. (St. Vincent's does not contend otherwise.) But Yelling has not provided sufficient evidence from which a jury could conclude the CDU was "permeated with 'discriminatory intimidation, ridicule, and insult, . . . sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

Showing that harassment is sufficiently severe or pervasive requires showing both a subjective and objective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). Specifically, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive . . . and this subjective perception must be objectively reasonable." *Id.* (quoting *Harris*, 510 U.S. at 21). Yelling has met her burden as to the subjective showing; she presented evidence clearly showing she subjectively perceived her coworkers' conduct as severe or pervasive. But she falls short as to the objective component.

"[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at

23). The Supreme Court, this court, and other Circuits have identified a nonexhaustive list of factors "to delineate a minimum level of severity or pervasiveness necessary for harassing conduct." *Mendoza*, 195 F.3d at 1246 (citations omitted). Those factors are (1) the conduct's frequency, (2) its severity, (3) whether it was physically threatening or humiliating, rather than "mere offensive utterance[s]," and (4) whether it unreasonably interfered with the employee's job performance. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris*, 510 U.S. at 23).

We examine the conduct in its context, "not as isolated acts." *Mendoza*, 195 F.3d at 1246 (citing *Allen*, 121 F.3d at 647). And this context includes comments and conduct beyond the timeframe otherwise actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002) (holding that the scope of harassment claims includes conduct that occurred outside 42 U.S.C. § 2000e-5(e)(1)'s EEOC filing period so long as the last-contributing act occurred within that period). We therefore recognize that the district court—by declining to consider Wilhite's statements about President Obama that were outside the EEOC charge period—did not consider the entire scope of Yelling's claim. But with a de novo review, it makes no difference now whether the district court did (or did not) consider all appropriate factors.

We conclude that Yelling has not presented evidence that would allow a reasonable jury to find in her favor. Yelling cites her own testimony that St. Vincent's became "kind of heated" with racist comments, or that her coworkers generally made racist

comments multiple times. But that testimony lacks the specificity necessary to show frequency. *Cf. Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153-54 (11th Cir. 2020) (reasoning that employee's testimony harassment occurred "every other day" or "nearly every day," which coworkers corroborated, was more specific than vague testimony harassment occurred "constantly"); *Nitkin v. Main Line Health*, 67 F.4th 565, 570-71 (3d Cir. 2023) (similar). And Yelling has not cited evidence that her coworkers' conduct was so extreme as to make up for the infrequency. *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1253-54 (11th Cir. 2014) (reasoning that where harassment is isolated but extreme, an employee may still have an actionable claim).

We begin with the comments about the former President and First Lady. We cannot say that all of these comments were race-based—as opposed to political or personal disagreement. For example, comments that the President was "stupid," the "worst," or a "piece of shit" are not inherently racial. But even if we considered these comments race-based, and even drawing all reasonable inferences in Yelling's favor, we conclude no reasonable jury could conclude these comments evince extreme harassment.

This is true even when considering these comments together with other comments—several of which plainly were racist. Those comments were only isolated epithets rather than extreme harassment. The mere fact that a supervisor (Wilhite) uttered at least one does not automatically transform the conduct (still inexcusable) from boorish or crude to extreme. *Cf. Adams*, 754 F.3d at

1254-55 (considering a supervisor who uttered "n-----" in front of plaintiff). And Yelling does not cite any evidence that her coworkers aimed these or any comments at her personally. To be sure, Yelling need not be the intended target of harassment to succeed. *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982). But overhearing offensive comments is less severe or humiliating than being the intended target of direct harassment. *See Adams*, 754 F.3d at 1251-57; *cf. Miller*, 277 F.3d at 1277 (reasoning that the plaintiff cited evidence of severe harassment where he "did not suffer from overhearing occasional off-color comments," but instead experienced a coworker's shouting derogatory names at him). Even *Smelter*, on which Yelling relies heavily, drew this distinction. 904 F.3d at 1285-86 ("[The harassing coworker] did not simply use the epithet in [the plaintiff's] presence; instead, she directed it at [the plaintiff] as a means of insulting her in the midst of an argument.").

Yelling also points to the Larimore, Calvert, and Laroe comments about being "confederate flag flyers" or "redneck" gun owners, which the district court did not view as race-based. She argues at length that we must view these statements as racial harassment because of the context in which they were made. But the problem is that Yelling does not cite evidence adequately illuminating the context she says we must consider. She instead relies heavily on generalizations about changing "societal norms"—such as recent civil rights protests and confederate monument removals—that shed no light on what she experienced at St. Vincent's. The evidence that Yelling does cite to that end is that she was regularly the only black nurse on her shift and that coworkers other than

Larimore, Calvert, and Laroe made racist statements about the Obamas and patients. But that does not speak to the context of the conversations in which the statements were uttered. Nothing cited suggests, for example, that a coworker called herself a "confederate flag flyer" in conjunction with a racial slur or in the same discussion as one.

We cannot conclude that the comments about the confederate flag or being gun-carrying rednecks were racial harassment since Yelling only offers them in a vacuum. But even if we agreed with Yelling that they were race-based harassment, the comments still would not—alone or with everything else Yelling offers—be sufficient to show a hostile work environment.

There is no question that Yelling overheard race-based comments that do not belong in any workplace. But it is a "bedrock principle" that not all subjectively offensive language in the workplace violates Title VII. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Title VII only prohibits harassment that is "so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81; *see also Smelter*, 904 F.3d at 1283 n.3, 1284. On this summary judgment record, no reasonable jury could conclude Yelling experienced that. Accordingly, the district court did not err in granting summary judgment as to Yelling's hostile work environment claims.

*B.*

Next is Yelling's retaliation claim, which she based on circumstantial evidence. This court has "primarily" relied on the

*McDonnell Douglas* framework to evaluate circumstantial-evidence-based employment claims at summary judgment. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1236 (11th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *see also Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1344-45 (11th Cir. 2022) (citing *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc)) (*McDonnell Douglas* applicable to Title VII claims); *Gogel*, 967 F.3d at 1134 (same for § 1981 claims). Under that familiar framework, a plaintiff must first make out a prima facie case by showing (1) she engaged in a statutorily protected activity, (2) she experienced an adverse employment action, and (3) causation. *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997) (citing *Coutu v. Martin Cnty. Bd. of Cnty. Cmm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)). If the plaintiff makes out a prima facie case, the employer must then "articulate a legitimate, non-discriminatory reason or reasons" for its actions. *Patterson*, 38 F.4th at 1345 (citing *Gogel*, 967 F.3d at 1135). If the employer does, the plaintiff must show that the proffered reasons were pretext and that the employer's real reason was retaliation. *Id.*; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Yelling contends that test does not apply here. She contends the Supreme Court's recent decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), shows that *McDonnell Douglas* has no application in "mixed motive Title VII retaliation" claims. Init. Br. at 36 (arguing that *Bostock* "made it clearer than ever that where an employee can point to *any* evidence of discrimination or retaliation,

21-10017                Opinion of the Court                15

the case must go to a jury" (emphasis added)).[2] She contends the appropriate standard for her retaliation claim is akin to the standard used for mixed-motive discrimination claims under Title VII. *Cf. Quigg,* 814 F.3d at 1235.[3] She alternatively contends that if *McDonnell Douglas* does apply, she has shown enough to survive it. Finally, she contends that—*McDonnell Douglas* aside—she has presented

_____

[2] Yelling did not plead a mixed motive in her complaint, and it is an open question in this Circuit whether that is necessary. Some unpublished decisions suggest pleading mixed-motive causation is not required, *see Williams v. Fla. Atl. Univ.*, 728 F. App'x 996, 999 (11th Cir. 2018); *Williams v. Housing Auth. of Savannah, Inc.*, 834 F. App'x 482, 489 (11th Cir. 2020), while others have suggested it is, *Stevenson v. City of Sunrise*, 2021 WL 4806722, at *7 (11th Cir. Oct. 15, 2021); *Fonte v. Lee Mem'l Health Sys.*, 2021 WL 5368096, at *4 (11th Cir. Nov. 18, 2021); *Smith v. Vestavia Hills Bd. of Ed.*, 791 F. App'x 127, 130-31 (11th Cir. 2019). St. Vincent's did not argue any pleading deficiency, so we assume (without deciding) that there is none.

[3] A plaintiff can survive summary judgment on a Title VII discrimination claim under 42 U.S.C. § 2000e-2(a)(1) by showing that, although an employer was motivated by more than one reason to take a particular action, a discriminatory reason was "a motivating factor" for the adverse employment action. *Quigg*, 814 F.3d at 1239; *see also* 42 U.S.C. § 2000e-2(a)(1). This theory is known as a "motivating factor" or "mixed-motive" discrimination claim. In other words, under the mixed-motive standard, when a plaintiff claims that the employer acted with mixed motives—and one of those motives was discriminatory—the plaintiff's claim can proceed, and the plaintiff is not required to prove that the employer's stated reason for the adverse action was pretextual. *Id.* at 1238-39.

Importantly, however, Yelling's Title VII retaliation claim is brought under 42 U.S.C. § 2000e-3(a), not § 2000e-2(a)(1). Thus, as explained further in this opinion, the mixed-motive framework does not apply to claims under § 2000e-3(a). Yelling's arguments to the contrary are unpersuasive.

enough evidence to show a convincing mosaic of retaliation. Yelling is incorrect on each contention.

1.

Though available for Title VII discrimination claims, it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).[4] Rather, to succeed on her retaliation claim, Yelling must show that her "protected activity was a but-for cause of the alleged adverse action." *Id.* at 362; *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (same standard for § 1981 case). The but-for standard asks whether "a particular outcome would not have happened 'but for' the purported cause." *Bostock*, 140 S. Ct. at 1739 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

---

[4] We use the term "mixed motive" to refer to claims based on the "motivating-factor" standard applicable in Title VII discrimination claims. *See Quigg*, 814 F.3d at 1235 ("An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." (quoting 42 U.S.C. § 2000e–2(m))). At any rate, to the extent a retaliation claim based on multiple but-for causes is fairly called a "mixed-motive" claim, but-for causation still applies. *Cf. Gross*, 557 U.S. at 177-78.

As the Supreme Court explained in *Nassar*, the motivating-factor standard under § 2000e-2(m), on the other hand, requires a "lessened" showing. 570 U.S. at 349. That "lessened" showing is sufficient for a Title VII discrimination claim, which requires only a showing that race "was *a* motivating factor for the defendant's adverse employment action," even if some other (lawful) consideration would have led to the same outcome. *Quigg*, 814 F.3d at 1239 (citation omitted). In other words, the motivating-factor standard only asks whether "illegal bias played a role" even if bias was not a necessary link in the causal chain. *Id.* at 1241. If it did, the claim can proceed.

But, as the Supreme Court made clear in *Nassar*, that "lessened" showing has no application to retaliation claims—like Yelling's—or any other claim that requires but-for causation. 570 U.S. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

*Bostock*, which involved a Title VII sex discrimination claim—not a retaliation claim—did nothing to change this. *Bostock* noted that Title VII bars discrimination "because of" sex, *see* 42 U.S.C. § 2000e-2(a)(1); that "because of" incorporates traditional but-for causation; and that sometimes "events have multiple but-for causes." *Bostock*, 140 S. Ct. at 1739-40. That means an employer

18                    Opinion of the Court                    21-10017

cannot escape liability by pointing to some factor other than sex it considered if sex "was one but-for cause."[5] *Id.* at 1739.

*Bostock*'s description of but-for causation—and the idea that outcomes can have multiple but-for causes—was nothing new. The Court articulated the longstanding traditional test for but-for causation: "a but-for test directs us to change one thing at a time and see if the outcome changes." *Id.* That standard is "textbook tort law," *Nassar*, 570 U.S. at 347, and reflects "the common understanding" of factual causation, *Burrage v. United States*, 571 U.S. 204, 211-12 (2014) (illustrating the point with a baseball hypothetical).

In arguing that *Bostock* undermines application of *McDonnell Douglas* in the retaliation context, Yelling conflates the concept of multiple but-for causes with the concept of mixed motives. If there are multiple but-for causes, the removal of any one would change the outcome. Each would be a "necessary condition for the outcome," Restatement (Third) of Torts: Phys. & Emot. Harm § 26 cmt. b (Am. L. Inst. 2010), regardless of whether there was another such "necessary condition." Each could be viewed as "the straw that broke the camel's back." *Burrage*, 571 U.S. at 211; *cf. also Bostock*, 140 S. Ct. at 1742 ("If an employer would not have discharged

---

[5] *Bostock* also noted that the motivating-factor (*i.e.*, mixed-motive) test was alive and well for discrimination claims under § 2000e-2(a)(1), meaning that "liability [could] sometimes follow even if sex wasn't a but-for cause of the employer's challenged decision." *Bostock*, 140 S. Ct. at 1739–40. Nevertheless, *Bostock* focused its analysis on the traditional but-for causation standard because the motivating-factor test was not at play. *Id.* at 1740.

an employee but for that individual's sex, the statute's causation standard is met . . . .").

With a mixed-motive (or motivating-factor) claim, on the other hand, a plaintiff need only show that a protected consideration contributed in some way to the outcome—even if it ultimately changed nothing. *Quigg*, 814 F.3d at 1235. Consider the Supreme Court's example in *Babb v. Wilkie*:

> Suppose that a decision-maker is trying to decide whether to promote employee A, who is 35 years old, or employee B, who is 55. Under the employer's policy, candidates for promotion are first given numerical scores based on non-discriminatory factors. Candidates over the age of 40 are then docked five points, and the employee with the highest score is promoted. Based on the non-discriminatory factors, employee A (the 35-year-old) is given a score of 90, and employee B (the 55-year-old) gets a score of 85. But employee B is then docked 5 points because of age and thus ends up with a final score of 80. The decision-maker looks at the candidates' final scores and, seeing that employee A has the higher score, promotes employee A.

140 S. Ct. 1168, 1174 (2020). Age bias factored into (or motivated) the decision, meaning the decision was not "free from" discrimination. *Id.* (quoting 29 U.S.C. § 633a(a)). But the younger employee would have secured the promotion either way, meaning "age was not a but-for cause of the decision." *Id.* Rather than serving as one of several but-for causes, it was no but-for cause at all; it did not break the camel's back. But that did not defeat the claim because

(unlike here) the statute at issue, 29 U.S.C. § 633a(a), did not require but-for causation. Rather, the statute required "that personnel actions be untainted by any consideration of age." *Babb*, 140 S. Ct. at 1171.

Yelling's case is different. A Title VII retaliation claim requires "proof that the desire to retaliate was the but-for-cause of the challenged employment action." *Nassar*, 570 U.S. at 352; *id.* at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)."). Where but-for causation is required, a plaintiff with evidence of only a tagalong "forbidden consideration" cannot meet her summary judgment burden because she cannot show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

Here, Yelling alleges multiple but-for causes: she contends St. Vincent's took its adverse action because of unlawful retaliation and because of other lawful reasons. But this does not transform her claim into a mixed-motive claim, and it does not relieve her of her obligation to show an *unlawful* but-for cause resulted in the alleged wrongful action. Moreover, in the context of the *McDonnell Douglas* framework, it does not relieve Yelling of her obligation to respond to St. Vincent's legitimate reason with a showing of pretext.

It is true that if Yelling were correct that there were two but-for causes—unlawful retaliation and a lawful factor—she could

have a claim if the two combined to result in an adverse action that would not have occurred without that combination. In that instance, the retaliation would be a but-for cause because the adverse action would not have occurred without it. The fact that a lawful consideration was also a necessary factor would not defeat her claim. *See Bostock*, 140 S. Ct. at 1739.

But in this situation—and assuming Yelling makes a prima facie case—St. Vincent's can still meet its burden of production by showing that the adverse action was based on the lawful consideration. At this stage, where St. Vincent's burden is "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983), all St. Vincent's must do is produce evidence that it had a legitimate reason for its decision. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981). Thus, by articulating a legitimate reason—rather than remaining "silent in the face of the presumption" that follows a prima facie showing—St. Vincent's meets its burden, leaving Yelling to show that retaliation was a but-for cause of the adverse action. *Id.* at 254-56. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Gogel*, 967 F.3d at 1135 (quoting *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013)). In short, nothing about *Bostock* is inconsistent with applying *McDonnell Douglas* to claims requiring but-for causation—even if a plaintiff asserts multiple but-for causes. The district court therefore did not

err in applying it. And as we explain next, the district court did not err in concluding that Yelling could not succeed under that framework.

2.

Below, Yelling proffered four adverse employment actions: (1) the drug test and related suspension, (2) progressive discipline by the coaching and verbal agreement, (3) Dubose's not always choosing her as a relief charge nurse, and (4) her firing. The district court held that the first three did not qualify as "adverse employment actions." *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (holding that in the retaliation context, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). As for Yelling's firing, the court applied *McDonnell Douglas*. It reasoned that Yelling did not show but-for causation because there was no evidence that St. Vincent's justification—falsification of patient records—was pretextual.

We need not address whether the district court erred in holding that the first three events were not adverse actions. Even if all the events qualify, Yelling has not shown retaliatory intent was a but-for cause behind any of them.

First, assuming Yelling made out a prima facie case that the drug test and suspension were retaliatory, St. Vincent's satisfied its light burden of identifying a nonretaliatory reason for its actions: three witnesses reported that Yelling left the CDU without

explanation and looked under the influence when she returned. *See Chapman*, 229 F.3d at 1030. The question, then, is whether Yelling has pointed to evidence sufficient to allow a reasonable inference of pretext and that her protected conduct was a but-for cause. She has not.

Yelling cites the short time between her June 2015 complaints of racism and the subsequent drug test, but timing alone is not enough to show pretext. *See Gogel*, 967 F.3d at 1137 n.15. In short, Yelling has not rebutted St. Vincent's justification head on or plausibly suggested retaliation was the reason for the drug test and suspension. *Id.* at 1136.

Second, assuming Yelling made a prima facie showing as to St. Vincent's placing her in progressive discipline, she has again not shown pretext. St. Vincent's offered justifications that could motivate a reasonable employer: that Yelling ignored doctors' orders and made a patient uncomfortable by praying with her in an unwanted manner. Yelling contends she had good reasons for these actions. But it is not enough to quibble with St. Vincent's reasons. *Id.* at 1148-49 ("An employer 'may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason.'" (alteration in original) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999))); *Elrod v. Sears, Robuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). And Yelling has not shown that but for her protected conduct she would not have faced the same outcome.

Yelling points to no specific evidence to support her claim as to the relief charge nurse assignments. So she has made no prima facie case as to this proffered adverse action.

That leaves the fourth proffered action—Yelling's firing. Like the drug test, the adverse action occurred a short time (about two months) after Yelling complained of racism and filed an EEOC complaint. But St. Vincent's cited its belief, based on Yelling's tracking report and six witnesses, that Yelling falsified the Room 610 patient's treatment information. And Yelling does not rebut that explanation head on. Instead, citing how she told her supervisors her tracker sometimes malfunctioned, her argument boils down to a mere disagreement with the proffered explanation.

That is where Yelling's retaliatory-firing claim fails—she cites no evidence beyond mere temporal proximity indicating retaliatory intent. Her theory is that once she first reported racist comments in June, St. Vincent's began building a case against her—pointing to the drug test, her coworkers' complaints about her conduct, and the coaching and verbal agreements. While this court has reasoned before that intensive monitoring or harassment by supervisors can suggest pretext,[6] the evidence here does not allow an inference that St. Vincent's deliberately searched for a fabricated reason to fire Yelling.

---

[6] See *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 921 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522-23 (11th Cir. 1991), superseded on other grounds as stated in *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000).

In short, then, Yelling cannot survive summary judgment under the *McDonnell Douglas* framework.

3.

Yelling alternatively argues that her retaliation claims survive under a "broader" convincing mosaic analysis. As she correctly notes, plaintiffs relying on circumstantial evidence can always survive summary judgment if "circumstantial evidence raises a reasonable inference that the employer discriminated." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (explaining that *McDonnell Douglas* is not "the *sine qua non*" for employee plaintiffs).

This court has used the phrase "convincing mosaic" simply to recognize that courts must consider the totality of a plaintiff's circumstantial evidence on summary judgment. *See id.* That entire evidentiary picture may include, "among other things," (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citing *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). "Convincing mosaic," however, is not a "legal test of any kind." *Ortiz*, 834 F.3d at 764-65. At the end of the day, a retaliation plaintiff's "mosaic" of evidence must still be enough to allow a reasonable jury to infer but-for causation. *Cf. Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273-74 & n.2, 1277-81 (11th Cir. 2021). Yelling's evidence is insufficient to allow that inference.

*C.*

Last is Yelling's disparate-treatment claim. Yelling cites no direct evidence of intentional race discrimination. So to survive summary judgment, she had to point to sufficient circumstantial evidence of discriminatory intent. *See EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

Yelling proffered the same four adverse actions for her discrimination claim as for her retaliation claim. We need only address Yelling's firing, which is indisputably an adverse employment action. The district court held that the drug test, progressive discipline, and not being assigned as a relief charge nurse did not qualify as adverse actions for purposes of a discrimination claim. Yelling did not develop any detailed argument on appeal on why that was error, and she thus abandoned any claim challenging those three actions as racially discriminatory.[7] *See NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998).

As to her firing, Yelling argues that she presented a mixed-motive race discrimination claim and that the district court erred by applying *McDonnell Douglas*'s framework instead of *Quigg*'s mixed-motive standard. But even applying *Quigg*'s more lenient motivating-factor analysis, Yelling's discrimination claim still fails.

[7] Our conclusion here is not inconsistent with our earlier assumption that Yelling pointed to qualifying adverse actions for her retaliation claim. Employer conduct may be "adverse action" for purposes of a retaliation claim, but not under the narrower standard that governs disparate-treatment claims. *See Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008).

She cites no evidence by which a reasonable jury could conclude that race at least "played a role" in her firing.[8] *Quigg*, 814 F.3d at 1241. Yelling relies on the same evidence she cites to support her hostile work environment claim, namely that some people made racist comments about the Obamas and patients, St. Vincent's inaction on Yelling's complaints, and Dubose's "quota." That evidence does not remotely suggest St. Vincent's decisionmakers—one of whom was black—considered race when firing Yelling based on the tracking report. Nor does it suggest Yelling's race motivated any of the six witnesses who reported seeing her at the nurse station instead of Room 610. She says these were biased witnesses who made the racist comments discussed earlier, but she cites no evidence to support that.

Yelling also points to white staffers Felicia Parrish, Pike, and Powell, whom St. Vincent's did not fire for misconduct. But St. Vincent's disciplined them for mere negligent conduct—for not documenting patient-care information accurately or at all. Yelling, in contrast, allegedly committed a more severe intentional offense—*falsifying* patient information. St. Vincent's treatment of these three, therefore, does not support a reasonable inference that race played a role in Yelling's terminations.

---

[8] To the extent Yelling alternatively says the district court erred in its application of *McDonnell Douglas* (assuming a plaintiff can even argue both *McDonnell Douglas* and *Quigg* at the same time), she could not succeed under a true-motive theory for the same reason.

The district court did not err by granting summary judgment in St. Vincent's favor on the discrimination claim.

## IV.

The order granting summary judgment for St. Vincent's is **AFFIRMED.**

21-10017                BRASHER, J., Concurring                1

BRASHER, Circuit Judge, concurring:

I concur in the Court's opinion. I write separately to discuss the First Amendment implications of Ms. Yelling's request that we hold her employer liable under Title VII for failing to censor her co-workers' speech. To be clear, a private hospital can (and probably should) discourage its nurses from disparaging politicians and discussing divisive social issues in the hallway. But this case is ultimately about whether Title VII requires employers to adopt that kind of policy.

As many judges have noted, a Title VII hostile work environment claim is "unusual." *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 793 (9th Cir. 2005) (Fletcher, J., concurring). Title VII bars discriminatory treatment in the terms, conditions, or privileges of employment. But a harassment claim isn't based on "inequality in hiring, firing, promotions, or duties;" instead, it holds an employer liable because of "abusive behavior by [a plaintiff's] coworkers in the workplace." *Id.* Because an employer's liability for harassment sometimes turns on an employee's speech—what they said, how often they said it, and what they meant by it—avoiding liability for harassment requires an employer to prohibit certain kinds of speech in its workplace. *See Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc).

Although a private employer can adopt a speech code if it wants, the government usually cannot force people to speak in a particular way. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). For this reason, Title VII harassment law has always had an uneasy

coexistence with the First Amendment. The government can penalize speech when that speech is merely incidental to tortious conduct. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). And nonexpressive conduct is often the root of a workplace harassment claim. *Id.* But "[w]here pure expression is involved, Title VII steers into the territory of the First Amendment." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). After all, when a plaintiff brings a Title VII "harassment claim[] founded solely on verbal insults" or other speech, she is necessarily asking a court to impose "content-based, viewpoint-discriminatory restrictions on speech," *id.* at 596–97, and these kinds of restrictions are subject to strict judicial scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 172 (2015).

To be clear, not every application of harassment law raises free speech concerns. As I've already noted, the government can regulate non-expressive conduct, even if doing so has an incidental effect on speech. The First Amendment also "permit[s] restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Most relevant to workplace harassment, the government may ban: (1) obscenity, *Miller v. California*, 413 U.S. 15, 24 (1973), (2) "true threats" of violence, *Virginia v. Black*, 538 U.S. 343, 360 (2003), and (3) "fighting words"— "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," *Cohen v. California*, 403 U.S. 15, 20 (1971).

21-10017              BRASHER, J., Concurring                    3

Turning to the facts of this case, Ms. Yelling's hostile work environment claim is based on pure speech. The Court's opinion fulsomely catalogues the boorish comments that Ms. Yelling overheard. No one would confuse Ms. Yelling's co-workers with Marcus Cicero or Henry Clay. But the question remains: how should we assess this claim in light of the First Amendment?

The EEOC—which filed a thoughtful amicus brief in support of Yelling's position—says we should disregard any free-speech implications. Its position at oral argument, which is contrary to decades of precedent, was that the First Amendment has no role to play in tort litigation between private parties. That's the wrong answer. A court cannot enforce a law in a dispute between private parties if doing so requires it to "impose invalid restrictions on [a person's] constitutional freedoms of speech and press." *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) (noting "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988) (same).

For my part, I don't think we can ignore the tension between the First Amendment and Title VII harassment law. Instead, I think the objective prong of our hostile-work-environment standard must be applied consistent with First Amendment principles. That means that the closer objectionable workplace speech is to conduct or to traditionally unprotected areas of speech, the more leeway a court should have to find an objectively hostile work environment. But the closer objectionable speech comes to the heart of the First

4                    BRASHER, J., Concurring                    21-10017

Amendment, the more reluctant a court should be to impose tort liability because of it.

Our harassment law already draws many lines consistent with the First Amendment. Consider our conclusion that a supervisor's objectionable comments are objectively more severe than a co-worker's. The reason is that a supervisor's objectionable comments carry an implicit threat of illegal *conduct*—discriminatory treatment in promotion or termination—and a co-worker's may not. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) (noting a supervisor's "advocacy of discriminatory ideas can connote an implicit threat of discriminatory treatment"). Likewise, we have recognized that overhearing an offensive comment is less severe than being the target of that comment. *See e.g.*, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250–57 (11th Cir. 2014) (finding direct racist comments to be inherently more harassing than indirect ones). That line makes sense, in part, because the latter is much closer to "fighting words" than the former. Direct insults do not "seek to disseminate a message to the general public, but to intrude upon the targeted [listener], and to do so in an especially offensive way." *Frisby v. Schultz,* 487 U.S. 474, 486 (1988).

Likewise, I would hold that speech on public matters is inherently less likely to create a hostile work environment than speech on private matters. "[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). But we give the

highest degree of protection to speech on matters of public concern—that is, speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). For this reason, "even those commentators who conclude the First Amendment generally permits application of harassment laws to workplace speech recognize exceptions" for "debate on issues of public concern." *Avis Rent A Car Sys., Inc. v. Aguilar*, 529 U.S. 1138, 1141–42 (2000) (Thomas, J., dissenting from denial of certiorari) (citing Richard H. Fallon, Jr., *Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn't Bark*, 1994 SUP. CT. REV. 1, 41, 47 (1994)). *See generally* Eugene Volokh, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1849 (1992).

In any event, these principles are one reason I agree with the Court that Ms. Yelling's hostile work environment claim fails as a matter of law. As Justice Sotomayor recently reminded us, "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it." *Counterman v. Colorado*, 143 S. Ct. 2106, 2121-22 (2023) (Sotomayor, J., concurring). I think we should apply the objective element of workplace harassment law consistent with that idea.