**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-10604

Non-Argument Calendar

_____

AHMED S. ISMAEL,

*Plaintiff-Appellant,*

*versus*

SHERIFF RICHARD ROUNDTREE,
  in his individual and official capacity as Sheriff of the Richmond
  County Sheriff's Office,
CAPT. EVERETTE JENKINS,
  in his individual capacity and acting under color of law as supervisor
  of the Richmond County Sheriffs Office,
SGT. WILLIAM MCCARTY,
  in his individual capacity acting under color of law as a supervisor
  of the Richmond County Sheriffs Office,
COL. CALVIN CHEW,
  in his individual capacity acting under color of law as a supervisor
  of the Richmond County Sheriff's Office,

*Defendants-Appellees,*

AUGUSTA RICHMOND COUNTY COMMISSION,

*Defendant.*

———————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:22-cv-00108-JRH-BKE

———————————

Before ABUDU, TJOFLAT, and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Ahmed Ismael appeals the District Court's grant of summary judgment, which dismissed his § 1981 retaliatory discharge suit. We hold that the District Court improperly conflated the *McDonnell Douglas* pretext analysis and the "convincing mosaic" standard. We reverse and remand for the District Court to, in the first instance, apply the correct standard.

## I. BACKGROUND

The Richmond County Sherrif's Office ("RCSO") hired Ismael as a deputy sheriff on March 21, 2020. Shortly thereafter, Ismael was offered the opportunity to work an ongoing special, off-duty, assignment providing security at the Urban Air Adventure Park in Augusta, Georgia ("Urban Air"). By mid-2021, Ismael was promoted to "officer-in-charge" at Urban Air.

### A. Ismael's Alleged Workplace Harassment

Lieutenant Everette Jenkins worked the Urban Air special assignment with Ismael. There, Ismael alleges that Jenkins frequently harassed him because of his race. Ismael was born in the Republic of Iraq and is a person of Arabic descent. Jenkins allegedly

called Ismael a "terrorist," told him to "go play in the sand," and warned colleagues that Ismael "may have a bomb." Jenkins admitted to making the terrorist comment but denied all others.

The owner of Urban Air, William Gilbert, testified that he "frequently" witnessed Jenkins make racist remarks to Ismael. General Manager Jordan Chambliss said there was "not one instance" where Jenkins "did not refer to [Ismael] as a terrorist, or make some crude remark about sand, bombs or not being able to speak English."

Jenkins' job performance was allegedly less than stellar. Gilbert testified that he had to ask Jenkins at least five times to do his job instead of sitting in his car in the parking lot. He described Jenkins' work ethic as "unprofessional." Chambliss added that Jenkins "was late to most every shift," often left early, but always demanded a full paycheck.

At the same time, Jenkins was the commander of the RCSO SWAT team, which Ismael hoped to join. Though Ismael wanted to report Jenkins' racial harassment and poor job performance, Jenkins allegedly warned Ismael that it would sink his chances at making the SWAT team. According to Chambliss, Jenkins "made it abundantly clear that he could walk all over Ismael because he would be the determining factor as to whether he would ever make it onto 'his' team or approve any training."

### B. Ismael's Formal Complaint and Firing

On September 13, 2021, Ismael attended a five-day SWAT team training course in Forsyth County. On the final day, Ismael

failed the written exam, and, accordingly, Jenkins told him he could not join the team. Ismael's drive home was approximately two-and-a-half hours. Although he was driving his patrol vehicle and still in RCSO uniform, Ismael decided to briefly visit the Burke County Sherrif's Office ("Burke County") to inquire about job openings. He was told that he could apply online and completed his drive home.

Since Ismael was no longer a prospect for the SWAT team, Jenkins no longer had leverage over Ismael. Accordingly, Ismael filed an internal affairs complaint on Monday, September 20, 2021. He detailed Jenkins' offensive remarks, harassment, and general misconduct at Urban Air. Gilbert and Chambliss submitted letters corroborating Ismael's account. At the time he filed the complaint, Ismael was in good standing with RCSO and had no prior disciplinary infractions.

Sergeant William McCarty was assigned to investigate Ismael's complaint. McCarty's investigation included calls to at least seven officers and an interview with Jenkins. McCarty tried to call Gilbert and Chambliss but could not reach them. He issued his report on October 19, 2021, writing that he could not verify Ismael's allegations and concluding: "The complaint is not sustained."

On September 23, 2021, while the investigation into Jenkins was still ongoing, McCarty received an email from Jimmy Wylds of Burke County, inquiring about Ismael. First, McCarty forwarded

the email to RCSO Captain Glen Rahn, writing "Lookie here." Then McCarty answered Wylds:

> Ismael isn't very impressive. He failed swat school and Jenkins told him he had to turn his stuff in. So now Ismael has filed a complaint against Jenkins claiming hostile work environment among other things which I am having to deal with. I worked a special with him one night and he seems to have a big chip on his shoulder about something.
>
> **Discipline wise he ok…thus far.**

(emphasis added)

A few days later, RCSO Colonel Calvin Chew allegedly received a call from an anonymous Burke County deputy. According to Chew, the deputy told him about Ismael's brief pit-stop to Burke County to inquire about job openings. McCarty emailed Wylds to confirm this information, and Wylds responded affirmatively.

Here, the parties differ on a couple of facts. In discovery, Ismael received access to Chew's phone records, which show that no anonymous call was received in the timeframe alleged by Chew. Ismael, though, does not assert an alternative theory as to how McCarty and RCSO learned about his visit to Burke County. The parties also differ on whether Ismael was technically "on duty" or "off duty" when he stopped at Burke County, and whether his behavior violated an official RCSO policy. McCarty flip-flopped as to whether Ismael was on or off duty but eventually testified: "I would probably say that he was off duty." Nonetheless, Appellees

contend that "[w]hether he was off duty or on duty, the act of using a patrol vehicle for personal errands is a violation of RCSO policy."

On September 28, 2021, Ismael was slated to begin work at 6:00 p.m. He scheduled an interview with Burke County at noon, believing he would have ample time before beginning his shift. Shortly before his interview, though, McCarty called Ismael and asked him to report to RCSO "as soon as possible." McCarty testified that the timing was merely "coincidental." Ismael attended the interview in uniform and then reported directly to RCSO. During the interview, Chew allegedly received a second anonymous call, informing him that Ismael had returned to Burke County.

At this point, Rahn emailed Chew and Sherriff Roundtree the following: "Just confirmed Deputy [Ismael] was in Burke County in our vehicle doing an interview to be hired. He will not be hired and we will have the DR for Termination ready by the time we finish talking with him." A few minutes later, McCarty began the termination paperwork. The report cited a violation of RCSO's "Manner of Conduct" policy Rule 4.4.[1] It listed two incidents: (1) Ismael visiting Burke County on September 17, 2021, in his patrol car to inquire about employment opportunities while he was "still on Richmond County time" and (2) Ismael visiting Burke County on September 28, 2021, in his patrol car to interview for a

---

[1] Rule 4.4 reads, in relevant part: "An off-duty employee will not conduct themselves in a manner as to reflect discredit upon the Sherriff's Office."

position. Sherriff Roundtree signed the termination report that same day.

### C. Lawsuit and Ismael's Evidence of Retaliation

Ismael claims he was fired in retaliation for his harassment complaint against Jenkins. On August 14, 2022, Ismael sued Roundtree, Jenkins, McCarty, and Chew for retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.[2] He amended his complaint twice, retaining only the § 1981 claim. Discovery commenced, and Defendants moved for summary judgment. In response to Defendants' motion for summary judgment, Ismael presented the following circumstantial evidence in support of his claim:

- McCarty's email to Wylds, where he improperly disclosed Ismael's hostile work environment complaint and wrote that Ismael's disciplinary status is "okay…thus far," potentially suggesting it would not remain "okay" for long.

- Phone records showing that Chew did not receive any anonymous calls during the timeframe he alleges.

- Affidavits from former RCSO personnel stating that they often made personal detours in their patrol vehicles, that

---

[2] Ismael also alleged a conspiracy to deprive him of equal protection under law in violation of both 42 U.S.C. §§ 1985 and 1986. These counts were later dropped.

supervising officers knew of the practice, and that they were never investigated or punished.

- McCarty's testimony that he could not recall any other officer being investigated or punished for making personal use of their patrol vehicle.

- Roundtree's inability to find records or otherwise identify specific instances of officers disciplined for similar vehicle infractions, despite testifying that it happened in the past.

- Roundtree's testimony that he was "very good friends" with Jenkins for over twenty-five years.

- The fact that Ismael was fired only eight days after filing his complaint against Jenkins.

- Ismael's termination report, which was created before he was interviewed about or informed of an investigation into his potential misconduct, contrary to RCSO investigatory procedures.

- Roundtree and McCarty's early insistence that Ismael was fired for using his patrol car for personal errands while "on duty," followed by McCarty's acknowledgment that he was "probably . . . off duty."

- The disparity between the investigations conducted into Jenkins and Ismael.

The District Court granted the motion for summary judgment. First, the Court found that Ismael had established a prima

facie case under *McDonnell Douglas*. Then, the Court found that the defendants properly articulated a legitimate, non-retaliatory reason for Ismael's termination. Finally, the Court held that Ismael "failed to prove" that the defendants' articulated reason was a pretext for retaliation.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, conducting our inquiry with the same legal principles as the district court. *Batson v. Salvation Army*, 897 F.3d 1320, 1325 (11th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). All reasonable inferences must be drawn in favor of the nonmoving party, but a "mere scintilla of evidence . . . will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## III. DISCUSSION

42 U.S.C. § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws . . . as is enjoyed by white citizens." In 1975, the Supreme Court held that § 1981 "affords a federal remedy against discrimination in private employment," notwithstanding

other available remedies like Title VII.[3] *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 457–61, 95 S. Ct. 1716, 1719–20 (1975). In 2008, the Court held that § 1981 also supports a private cause of action for employees who face retaliation for their complaints about workplace discrimination. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445, 128 S. Ct. 1951, 1954 (2008).

## A. The District Court Conflated *McDonnell Douglas* Pretext and the Convincing Mosaic Standard

Employment discrimination and retaliation cases, including those brought under § 1981, are shaped by the famous yet ill-understood Supreme Court holding in *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). There, the Court introduced a three-part evidentiary burden shifting framework:

1. First, the plaintiff demonstrates a prima facie case, which may be done by showing: (i) the plaintiff is in a protected group; (ii) the plaintiff was well qualified; (iii) the plaintiff suffered an adverse employment action; and (iv) the plaintiff was treated less favorably than similarly situated employees outside of the plaintiff's protected group.

---

[3] State and local government employees must bring their § 1981 claims under § 1983, because it serves as the "exclusive federal remedy for violations of the rights guaranteed in § 1981 by state governmental units." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S. Ct. 2702, 2722 (1989). Here, plaintiffs appropriately brought their action under § 1983.

2. Second, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action.

3. Third, if the employer provides an adequate reason, the plaintiff has the opportunity to demonstrate that the employer's proffered rationale is pretextual.

*See id.* at 802–04, 93 S. Ct. at 1824–25; *see also Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). Retaliation claims (as opposed to direct discrimination claims) follow the same framework, but the prima facie case is modified. There, a plaintiff must show: (i) that she engaged in a protected activity, like filing a complaint for discrimination; (ii) that she suffered a material adverse action; and (iii) that there was a causal connection between the protected activity and the adverse action. *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).

The *McDonnell Douglas* framework is canonical; it can be found in first order across employment law textbooks, treatises, and hornbooks. But burden-shifting regimes are hardly unique; many have existed for centuries at common law. *See, e.g., Byrne v. Boadle*, 159 Eng. Rep. 200 (Exch. 1863). Our Court has repeatedly intimated that *McDonnell Douglas* is not all it's cracked up to be. To understand what the framework does, we find it useful to begin by answering what it *does not* do.

### 1. *McDonnell Douglas* is Limited

Decisions from both the Supreme Court and our Circuit cabin the substantive application of *McDonnell Douglas*. First,

*McDonnell Douglas* "is an evidentiary standard, not a pleading requirement," so it has no application on a motion to dismiss. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510, 122 S. Ct. 992, 997 (2002). Second, it plays no role at trial. *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322 (11th Cir. 1999) ("It is unnecessary and inappropriate to instruct the jury on the *McDonnell Douglas* analysis."); *Postal Serv. Bd. of Governors. v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482 (1983) (reversing bench trial findings because the court "erroneously focused on the question of *prima facie case* rather than directly on the question of discrimination"). This is because "once the prima facie case has 'fulfilled its role in forcing the defendant to come forward with some response,' it no longer has any work to do." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 945 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 154 (2024) (quoting *St. Mary's Honor Ctr. v. Hicks*, 609 U.S. 502, 510–11 113 S. Ct. 2742, 2742 (1993)). Third, the framework is inapplicable on post-trial motions. *Aikens*, 460 U.S. at 715, 103 S. Ct. at 1482 (1983).

Most relevant here, our Court has held that *McDonnell Douglas* was "never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). In *Smith*, we held (1) that a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent" and (2) that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to

infer intentional discrimination by the decisionmaker." *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)) (internal quotation marks omitted).

This holding adopted what is often referred to as the "convincing mosaic standard." *See*, *e.g.*, *Tynes*, 88 F.4th at 946. We have applied it in equal measure to claims of discrimination and retaliation. *Berry v. Crestwood Healthcare*, 84 F.4th 1300, 1310 (11th Cir. 2023) ("An employee may rely on a convincing mosaic of circumstantial evidence to prove retaliation."). Initially, there was confusion as to whether we had created a new analytical framework, something of a *McDonnell Douglas* 2.0. In time, however, we made clear that the "convincing mosaic" analysis—despite its flowery language—is a stand-in for the Rule 56 summary judgment standard applied to employment discrimination. *See id.* at 1311 ("[A] 'convincing mosaic' is a metaphor, not a legal test and not a framework."); *Tynes*, 88 F.4th at 1311 (describing the convincing mosaic standard as a "rearticulation of the summary judgment standard").

As in other contexts, a plaintiff may avoid summary judgment by presenting a wide range of circumstantial evidence. Such evidence may include "(1) suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Silverman*, 673 F.3d at 733–34) (internal quotation marks omitted).

### 2. Convincing Mosaic is Broader than Pretext

Our precedent, then, makes clear that a plaintiff who cannot establish the *McDonnell Douglas* prima facie case is entitled to a full review under the convincing mosaic standard. But here, Ismael *did* establish his prima facie case, and the District Court advanced to steps two and three of *McDonnell Douglas*. At step three, the Court held that Ismael failed to raise an inference of pretext. But the Court was confronted with one final question: should it *also* analyze the evidence under the convincing mosaic standard? It declined, reasoning that a separate analysis would be redundant. Relying on dicta in *Ossman v. Meredith Corp.*, the District Court decided that "the convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework," so it "need not decide if the convincing mosaic framework also serves as an independent basis" to support Ismael's claim. 82 F.4th 1007, 1020 (11th Cir. 2023).

Appellees ask us to sign off on this interpretation. They argue that "the terms pretext, convincing mosaic, and summary judgment are substantively the same thing" and that "the pretext prong . . . is the same as the ordinary summary judgment standard." We disagree. Though we recognize that both inquiries are probative of the same ultimate question, we are persuaded that they are not identical.

To show pretext, a plaintiff must show "*both* that the [employer's] reason was false, *and* that discrimination was the real reason" for the adverse action. *Hicks*, 509 U.S. at 515, 113 S. Ct. at 2752.

The latter requirement unquestionably holds the same focus as the convincing mosaic standard. The former, however, does not. Requiring a plaintiff to negate the defendant's explanation on summary judgment has at least two defects. First, it is not required to succeed at trial. Second, it detracts from the plaintiff's affirmative case that the driving cause was illegal discrimination or retaliation.

In *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, the Supreme Court held that claims brought under § 1981 must show that an illicit motive was a "but-for" cause for the adverse action, rather than merely a "motivating factor." 589 U.S. 327, 340, 140 S. Ct. 1009, 1019 (2020). But it is not required, under either § 1981 or Title VII, to show that the unlawful purpose was the *only* contributing factor. "[T]he traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656, 140 S. Ct. 1731, 1739 (2020).

A plaintiff can even succeed where there are multiple but-for causes: "so long as the plaintiff's [protected characteristic] was *one but-for cause* of [the adverse] decision, that is enough to trigger the law." *Id.* at 656, 140 S. Ct. at 1739 (emphasis added). In this situation, the employer's reason might be both factually grounded and directly causal—in other words, unassailable as pretext. If we require the plaintiff to negate their counterparty's rationale, we permit the absurd result of a plaintiff losing on summary judgment

for failing to demonstrate a falsity that she would not need to show at trial.

Moreover, focusing on the defendant's justification can lead both litigants and the court down a rabbit hole that obfuscates the plaintiff's affirmative claim. This is precisely what we sought to avoid when we adopted the convincing mosaic standard. *See Smith*, 644 F.3d at 1328. In *Tynes*, we emphasized that, at summary judgment, "we ask only one question: whether there is sufficient evidentiary basis for the jury to find that the defendant internationally discriminated against the plaintiff." 88 F.4th at 947. In retaliation claims, we ask whether the defendant intentionally retaliated against the plaintiff because of the plaintiff's protected activity. *Berry*, 84 F.4th at 1310. These questions appropriately frame the inquiry on the plaintiff's asserted theory of the case. By contrast, the pretext inquiry lets the defendant's explanation take center stage, requiring the plaintiff to present contradictory evidence rather than direct or circumstantial evidence supporting an inference of discrimination.

Surely, the plaintiff might find it useful to attack the defendant's account. Evidence that their explanation is untruthful, inconsistent, or that the alleged conduct was not typically punished may all be probative of malfeasance. But, as we have explained before, the "entire evidentiary picture" goes further than pretext. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1242 (11th Cir. 2023). Our precedent specifically describes evidence of pretext as *a subset* of potentially relevant circumstantial evidence. *Id.* And, while this

Circuit has no published opinion finding the requisite summary judgment inference after a plaintiff failed on pretext,[4] we have recognized the possibility, and we conduct both analyses accordingly. *See id.*; *Berry*, 84 F.4th at 1310.

Finally, we do not think the Supreme Court intended pretext to be the sole determinate at any stage of litigation, but especially at summary judgment. In *McDonnell Douglas*, the Court held that when a defendant's reason for the adverse action "suffices to meet the prima facie case," the plaintiff must "be *afforded a fair opportunity to show* that [the defendant's] stated reason for [the plaintiff's] rejection was in fact pretext." 411 U.S. at 804, 93 S. Ct. at 1825 (emphasis added). We do not take this language to reframe the dispositive question on summary judgment or at trial, but rather to emphasize that the "inquiry must not end" with a defendant's plausible explanation. *See id.* Even taken literally, the plaintiff is always given the "opportunity" to show pretext; our Court has simply elaborated that it is not the "exclusive means" to survive summary judgment. *See Berry*, 84 F.4th at 1310.

In *Burdine*, the Supreme Court further explained that the plaintiff's "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision . . . merges

---

[4] In a 2023 unpublished opinion, however, we found exactly this. *See Brown v. Wrigley Mfg. Co., LLC*, No. 21-11328, 2023 WL 2386500, at *6 (11th Cir. Mar. 7, 2023). There, we concluded that the plaintiff did not show pretext under *McDonnell Douglas* but that he did present a convincing mosaic of discriminatory intent because that standard allowed him to add his "more general evidence of discriminatory intent to the equation." *Id.*

with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." 450 U.S. at 256, 101 S. Ct. at 1095. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* This appropriately categorizes pretext as an *avenue* to demonstrate the defendant's illicit motive, but not as the end-all be-all.

Most recently, Justices Thomas and Gorsuch dissented from a denial of certiorari, arguing that the *McDonnell Douglas* framework has spawned "widespread confusion" and that the Court should offer "clear guidance" on how lower courts should conduct their review on summary judgment. *Hittle v. City of Stockton, California*, 604 U.S. __, __, 145 S. Ct. 759, 763 (2025) (Thomas, J., dissenting from denial of certiorari). The posture in *Hittle* matches the posture here; the district court granted summary judgment "on the ground that Hittle had not shown sufficient evidence of pretext." *Id.* at __, 145 S. Ct. at 763–64. Thomas explained:

> This case highlights how *McDonnell Douglas* may distort a lower court's analysis. Hittle presented "ample" evidence of discriminatory intent on the part of those who decided to terminate him. That evidence is more than likely sufficient for Hittle to establish a genuine dispute of material fact as required by Rule 56. Yet, after applying *McDonnell Douglas*, the District Court and the Ninth Circuit ruled for the city.

*Id.* at __, 145 S. Ct. at 764. Though we lack clarity from the Supreme Court regarding *McDonnell Douglas'* appropriate role—if any—at summary judgment, we reaffirm that it is not the only game in town, and that it does not supplant Rule 56.

A plaintiff must be afforded the opportunity to confront her burden of proof head-on, if she so chooses. Our Court's convincing mosaic standard heeds this directive and preserves the plaintiff's opportunity at summary judgment to directly create an inference of discrimination or retaliation—"shorn of all [the] *McDonnell Douglas* prophylaxis." *Tynes*, 88 F.4th at 953 (Newsom, J., concurring). For these reasons, we hold that summary judgment should not be granted for failure to demonstrate pretext unless it also "reflects a failure to put forward enough evidence for a jury to find for the plaintiff on the ultimate question of discrimination" or retaliation. *Id.* at 947.

## B. The Legal Error Stifled Review of Ismael's Evidence

The previous Section explains why, as a legal matter, the District Court was wrong to conflate a showing of pretext with the standard to survive summary judgment. If we could find that this error was in name only, and that the district court considered all appropriate evidence, it might have been a harmless error. *See* 28 U.S.C. § 2111 ("[T]he court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). But the Court's language shows that it focused narrowly on the defendant's purported

rationale and ignored other evidence probative of Appellees' illicit intent.

For example, Ismael presented evidence that other officers often ran errands in their patrol cars, such as picking up food, going to the gym, and picking up children, but were never punished. The Court found this immaterial:

> [E]ven assuming the alleged personal errands were common and Defendants were aware of these practices, they do not show the reason for [Ismael's] termination was unworthy of credence because these are not appropriate comparators, nor do they establish conflicting testimony regarding the reason for [Ismael's] termination. Further, the fact that no other officer has been fired for similar conduct, without evidence another officer has actually engaged in sufficiently similar conduct, does not *prove* the stated reason was false.

(emphasis added). The Court treated just about all of Ismael's evidence this way: rejecting it unless it "negated the proffered reason" for his termination.

As a threshold matter, Ismael does not need to "prove" anything to defeat a motion for summary judgment. Moreover, comparator evidence can still be useful even where there are "material differences" between a plaintiff and her comparator. *Tynes*, 88 F.4th at 947. "[I]t is the jury's role—not ours—to determine how much weight comparator evidence should be given." *Id.* at 947; *see also Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022) (finding

circumstantial evidence probative even when lacking a "strict comparator"). And, as we emphasize today, evidence does not need to attack—or even have anything to do with—the defendant's purported rationale to help raise an inference of discrimination.

Because the District Court only analyzed Ismael's claim through the narrow lens of *McDonnell Douglas* pretext, we reverse and remand with instruction to apply the correct summary judgment standard. Specifically, the Court should ask whether Ismael's circumstantial evidence, when artfully adhered together and viewed as one, allows a reasonable juror to envision an image of retaliation and find in Ismael's favor.

### C. Proper Review on Summary Judgment

Today's holding takes one more swing at the *McDonnell Douglas* game of whack-a-mole, where we must strike down courts that find new and creative ways to incorrectly apply the framework as substantive doctrine. Correctly understood, *McDonnell Douglas* is a "procedural device, designed only to establish an order of proof and production." *Hicks*, 509 U.S. at 521, 113 S. Ct. at 2754. No more, no less. Accordingly, we offer the following instruction for district courts to properly review summary judgment motions. The roadmap differs depending on whether the plaintiff can demonstrate a prima facie case or not.

### 1. Plaintiff Demonstrates Prima Facie Case

If the plaintiff can establish a prima facie case, she is entitled to a rebuttable presumption of illicit intent. This necessarily means that if the defendant fails to proffer evidence of a legitimate reason

for the adverse employment action, summary judgment in favor of the plaintiff is appropriate.[5]

Where, as is more common, the defendant comes forth with evidence and successfully rebuts the presumption, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Hicks*, 509 U.S. at 510, 113 S. Ct. at 2749. It "simply drops out of the picture." *Id*. at 511, 113 S. Ct. at 2749. At this point, the court must proceed to ask whether "the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker." *Smith*, 644 F.3d at 1328. A showing of pretext (or lack thereof) would certainly be relevant. But a plaintiff's inability to disprove the defendant's rationale cannot be the sole grounds for summary judgment.

### 2. Plaintiff Fails to Demonstrate Prima Facie Case

If the plaintiff cannot establish a prima facie case, she does not automatically lose on summary judgment. *See Smith*, 644 F.4th at 1328. In *Tynes*, we explained why this is so:

> When the Supreme Court uses the term "prima facie case" in this context, it does so "in a special sense." The Court itself has explained that although that phrase may sometimes "describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue," within the *McDonnell*

---

[5] Or, if only the defendant has moved for summary judgment, the court must reject that motion.

> *Douglas* framework the term "prima facie case" has a
> different meaning—it marks "the establishment of a
> legally mandatory, rebuttable presumption."

88 F.4th at 945 (quoting *Burdine*, 450 U.S. at 254 n.7, 101 S.Ct. at 1094) (internal citations omitted). Rather than lose by default, the consequence is that the plaintiff must produce enough evidence, on her own and without any helpful evidentiary burdens or presumptions, to demonstrate a material issue of triable fact. A court, therefore, should advance directly to the convincing mosaic inquiry.

A helpful analogy can be drawn to the common law doctrine of res ipsa loquitur for negligence. If a plaintiff invokes that doctrine, the court must determine whether "the plaintiff's evidence is sufficient for a reasonable jury to find . . . the accident is of the type that usually happens because of negligence." Restatement (Third) of Torts: Phys. & Emot. Harm § 17 cmt. j (A.L.I. 2010). If the court so finds, some jurisdictions employ a "rebuttable presumption, thereby requiring the defendant to come forward with some exculpatory evidence or suffer judgment as a matter of law." *Id.* This "level[s] the playing field and encourage[s] the defendant to disclose relevant evidence." *Id.* cmt. i. But a court would never grant summary judgment just because a plaintiff failed res ipsa's threshold inquiry. Instead, it would evaluate the plaintiff's evidence under the appropriate summary judgment standard for ordinary negligence, without any inferences or presumptions.

*McDonnell Douglas*, like res ipsa, offers plaintiffs an evidentiary advantage if their case satisfies a preliminary assessment,

namely, the prima facie case. If plaintiffs cannot satisfy that test, the inquiry does not end. Rather, a district court must turn to evaluate the evidence before it, applying the duly promulgated Rule 56 summary judgment standard.

## IV. CONCLUSION

For the foregoing reasons, we reverse and remand for the District Court to apply the correct summary judgment standard in the first instance.

REVERSED and REMANDED.