**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-10378
Non-Argument Calendar
_____

KEITH COOPER,

*Plaintiff-Appellant,*

*versus*

AIRBUS AMERICAS, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:23-cv-00309-MU
_____

Before ROSENBAUM, JILL PRYOR, and ABUDU, Circuit Judges.

PER CURIAM:

After Keith Cooper was terminated from his position with Airbus America, Inc., he sued the company, bringing claims for race discrimination and retaliation under Title VII of the Civil

Rights Act of 1964 and 42 U.S.C. § 1981, as well as a retaliation claim under the Family and Medical Leave Act ("FMLA"). The district court granted summary judgment to Airbus on all claims, and Cooper appealed. After careful consideration, we affirm.

**I.**

Cooper, a Black man, began working for Airbus in 2019. He worked at its commercial aircraft production facility in Mobile, Alabama, known as the Final Assembly Line ("FAL"). Airbus has two primary work areas at the FAL: the flightline, where aircraft come when manufacturing is complete, and the flowline, where the aircraft building process occurs.

Airbus initially hired Cooper as a corrosion specialist. In this position, he was responsible for making certain that aircraft were properly sealed. He would receive work orders and then follow step-by-step instructions guiding his work on the aircraft.

After Airbus learned that Cooper had an associate's degree in applied sciences, it approached him about joining a mentorship program and applying for a manufacturing engineer ("ME") position. At Airbus, MEs play a critical role in aircraft construction because they serve as the main interface between the technicians who carry out the manufacturing process and the technical requirements that must be satisfied to ensure the safe production of an aircraft. To perform this role, MEs must understand Airbus's systems and then determine how those systems should be applied to

assemble an aircraft. The position is "highly technical." Doc. 63-5 at 4.[1]

Airbus relies on MEs to respond to a variety of issues that may arise in the manufacturing process. For example, if an aircraft has a non-conformity—that is, it deviates from the applicable technical standards—an ME is expected to assess the non-conformity, create any "specific work orders for FAL rework," and "establish/verify the technical content of [the] non-conformit[y]." Doc. 63-1 at 173. In addition, when there is a change in production, an ME is expected to "create reports, exchange information[,] and regularly inform the European manufacturing engineering back office about" the change. *Id.* An ME also must "[r]espond[] to technical questions and explain[] work orders/drawings, especially for aircraft mechanical related items." *Id.* Airbus assigns MEs to positions throughout the FAL, including in both the flightline and flowline areas.[2]

When hiring an ME, Airbus looks for candidates who have a combination of relevant experience and education. It prefers MEs to have at least two years of relevant work experience in a manufacturing environment, preferably with an aviation company. It also prefers for them to have a degree in "Mechanical Engineering,

---

[1] "Doc." numbers refer to the district court's docket entries.

[2] Airbus treats ME positions in the flightline and flowline areas as equivalent with no pay difference.

Aerospace Engineering, Industrial Engineering, or an equivalent combination of education and experience." *Id.* at 174.

Airbus provides training to new MEs. The training period lasts up to 18 months, with the actual length of the training depending on an ME's previous experience. Airbus expects that by the end of the training period an ME can work autonomously on an aircraft.

Cooper applied for the Airbus ME position. In February 2021, after completing two rounds of interviews, he was selected for the position. His promotion came with a substantial salary increase from approximately $35,000 to $75,000 per year.

Around the time he was selected for the ME position, Cooper contracted COVID-19 and missed six days of work. He requested FMLA leave, which Airbus approved. When Cooper recovered, he returned to work.

As a new ME, Cooper began training. Initially, he was trained by Airbus employee Reid Stewart. During the training period, Stewart repeatedly showed Cooper how to perform tasks that were part of the ME role. He became concerned that Cooper was struggling to grasp basic concepts. Cooper confided in other coworkers that he was not performing well.

Airbus tracked Cooper's progress during his training. In mid-May, after Cooper had worked as an ME for about three months, he met with Stewart and Bruno Fiton, the head of manufacturing engineering at the FAL facility, about his progress. Stewart and Fiton assessed Cooper's familiarity with various ME tasks. For each

task, they assigned Cooper a score between one and five. A one meant that he had never seen the task, a two meant that he needed to shadow others performing the task, a three meant that he knew how to perform the task, a four meant that he knew well how to perform the task, and a five meant that he was an expert. For about half the tasks, Cooper received a score of three. But for several tasks, he received scores of one or two. The ratings reflected that Cooper had never worked on a "concession" and did not know how to open one. Doc. 63-3 at 16. Fiton chided Stewart for not covering concessions with Cooper.

Stewart and Cooper's relationship was strained. Cooper admitted to Stewart that he accidentally had thrown away a set of training notes. Stewart told Cooper that this mistake was "unacceptable." Doc. 63-5 at 66. Cooper responded that Stewart "put too much pressure on him." *Id.*

A few days later, when Cooper was struggling with a task, Stewart became frustrated. Cooper told Stewart, "If I left town tomorrow and never came back, nobody would even notice." *Id.* at 67. Stewart responded that he would be "very concerned" if that happened and was "worried" about Cooper. *Id.* Cooper did not respond. Stewart reported this incident to human resources.

After this incident, Cooper, too, went to human resources. He emailed human resources specialist Ethan Mattocks with concerns about Stewart and the work environment in the flightline area. He reported that Stewart was an ineffective trainer who gave feedback "in an aggressive manner," leaving Cooper feeling "on

edge and uneasy." Doc. 63-1 at 180. Cooper acknowledged that he was not progressing but blamed Stewart for being "impatient." *Id.* He said that he felt "excluded from the team and discriminated against." *Id.*

Mattocks investigated Cooper's report. He and Stephanie Burt, a human resources director, met with Cooper. Cooper told them that Stewart and other ME employees regularly shot Nerf guns at work. He described how on one occasion Stewart held an "assault-type Nerf gun" up to his head. *Id.* at 91. Cooper also reported that another ME employee, Alex Tijerina, had called him "boy" and told him that he acted like a "[B]lack pastor." *Id.* at 64–65. After the investigation, Airbus issued verbal warnings to the employees who participated in the Nerf gun battles.

Around the same time, another employee complained to human resources that Cooper made comments about her Vietnamese nationality and her gender that she found uncomfortable. In investigating this report, Mattocks learned from other employees that Cooper sometimes stormed off from conversations and made concerning comments about his own mental state.

After meeting with Mattocks and Burt, Cooper confronted Stewart. He accused Stewart of "putting too much pressure" on him, "intimidat[ing]" him, and "terrifying" him. Doc. 63-3 at 19 (citation modified). After this conversation, Stewart told Airbus that he no longer wanted to serve as Cooper's trainer. Airbus agreed that Stewart would no longer train Cooper.

On May 28, about three days after Cooper contacted Mattocks, an incident occurred between Cooper and Tijerina. Cooper asked Tijerina about the status of an aircraft. Tijerina refused to help and told Cooper that he was not qualified for the job. Tijerina yelled and cursed at him for several minutes, saying he was "dumb, stupid, and uneducated." Doc. 63-1 at 181. Tijerina mentioned that he had a friend who wanted a job at Airbus but didn't get it because Cooper was hired.

After the confrontation, Cooper reported the incident to human resources. When Mattocks investigated the incident, other employees reported that Cooper said Tijerina "is in poor health and will be dead soon, so [Cooper] won't have to worry abou[t] it much longer." Doc. 63-5 at 73. Cooper denied making this statement.

After the incident with Tijerina, Cooper requested FMLA leave for anxiety and depression. Airbus allowed him to take leave, which lasted approximately two-and-a-half weeks. While Cooper was on leave, Mattocks directed Airbus's security guards to be on the lookout for him, explaining that the company had suspended his badge temporarily while investigating a "workplace verbal argument." Doc. 72-1 at 42. Mattocks advised the security guards that Cooper "did not do anything wrong" but noted that he had left the facility "in a pretty upset state." *Id.* Mattocks said that the company "[m]ost likely" would allow Cooper to return to work but asked the security guards to look out for him until a decision was made. *Id.* When Cooper completed his leave, Airbus permitted him to return to work.

When Cooper returned to work, he received a return-to-work expectations letter from Fiton and Mattocks. The letter stated that they wanted to offer Cooper "a constructive means to align on a path forward" and "a fresh start" with a new trainer, Bernard Bousquet. Doc. 63-3 at 23. While training with Bousquet, Cooper would have "weekly training checkpoints to ensure that [he was] meeting key milestones and to identify areas for support." *Id.* Fiton and Mattocks directed Cooper to raise any concerns about his professional development directly with his "trainer or a member of management." *Id.* They reminded him that they expected "[e]ffective, professional communication." *Id.*

Bousquet trained Cooper for several weeks. He was unsatisfied with Cooper's performance. On multiple occasions, Cooper left the office after making a mistake or was resistant to Bousquet's feedback. Bousquet became concerned that Cooper lacked sufficient technical knowledge to perform the ME role. Cooper, in turn, was unhappy with Bousquet as a trainer. He reported to human resources that Bousquet called him a "bullshitter" and stated that he did not "deserve to be out here." Doc. 63-1 at 109. After complaining to human resources about Bousquet, Cooper requested additional FMLA leave. Airbus approved the request, and Cooper was on leave for approximately two weeks.

When Cooper returned to work, Fiton and Mattocks moved him from the flightline area to the flowline area and placed him on a performance improvement plan ("PIP"). They told him that after reviewing his progress with his previous trainers, they determined

that he was "not at the level of expectation concerning the basic tasks [they] would expect to see after 5 months in the role." *Id.* at 193.

In the PIP, Fiton and Mattocks identified eleven tasks that they expected an ME would be able to perform after working for five months in the flightline area and one month in the flowline area. The PIP set a schedule over the next five weeks for Cooper to show that he could perform each task. Fiton and Mattocks advised that they would meet with Cooper each week to review his progress.

In the PIP, Fiton and Mattocks noted that Cooper had previously "engaged in conduct and behavior that need[ed] to be corrected immediately." *Id.* at 194. They referenced Cooper's dispute with Tijerina and warned that his conduct violated the company's values. They also mentioned how Cooper "demonstrated resistance to feedback" when training under Bousquet. *Id.* They directed him to "behave in a professional cooperative manner with all Airbus employees, particularly those employees on [his] team." *Id.*

Although the PIP was supposed to run for five weeks, Fiton and Mattocks could extend this period. The PIP warned that it was a "final corrective effort" and that if Cooper failed to meet its requirements, Airbus would take "corrective action up to and including termination." *Id.* at 193. Cooper refused to sign the PIP.

In the flowline area, Airbus assigned Cooper a new trainer, Eric Crosby. Over the next five weeks, Crosby trained Cooper. Each

week, Fiton and Mattocks met with Cooper to review his progress under the PIP and assign him a score on tasks listed in the PIP, using the same one-to-five scoring system that Stewart and Fiton had previously applied. After Cooper's second week in the flowline area,[3] Fiton rated Cooper's knowledge of the first three tasks identified in the PIP. He assigned Cooper a score of three for each task, which meant that Cooper knew how to do the task, and rated his progress as favorable. After the third week, Fiton assessed Cooper's knowledge of the fourth, fifth, and sixth tasks identified in the PIP. He assigned Cooper a score of three for one task and a score of two for the remaining two tasks, which meant that Cooper needed shadowing and additional training on those tasks. Fiton rated Cooper's progress as unfavorable. After the fourth week, Fiton rated Cooper's progress on the fifth through ninth tasks identified in the PIP, giving him a score of three on each task, and determined that he was progressing favorably.

After the fifth week, Fiton considered Cooper's progress on the final task identified in the PIP: the ability to release a simple work order for a simple task. Fiton rated Cooper as a two because he needed additional shadowing in this area. During their weekly meeting, Fiton asked Cooper to describe the problem and solution for the work order that he had completed. Although Cooper was able to navigate Airbus's software, he could not fully describe the underlying issue with the aircraft. Fiton concluded that Cooper had

---

[3] Cooper did not receive any ratings the first week to give him time to settle into the flowline area.

"memorized the process within the software" but did not "demonstrate an understanding of the aircraft issue that prompted use of the software in the first place." Doc. 63-5 at 9. Fiton determined that Cooper was "still unable to independently manage the critical analysis required of this role." Doc. 63-1 at 212. Fiton and Mattocks informed Cooper that they were extending the PIP.

After the meeting, Fiton and Mattocks were concerned because, after nearly seven months of training and working with three different trainers, Cooper did not understand the process behind work orders. They determined that he had a "demonstrated lack of analytical ability" and "did not foresee that there would come a time, either weeks or months into the future, that he could operate autonomously, or be assigned his own aircraft to manage." Doc. 63-5 at 9. Fiton and Mattocks consulted with Burt and others in Airbus leadership, and the company decided to terminate Cooper's employment. Mattocks informed Cooper that he was terminated.

Cooper, proceeding through counsel, sued Airbus. He initially brought race discrimination claims under Title VII and 42 U.S.C. § 1981. After Airbus filed an answer, the magistrate judge[4] entered a scheduling order that set deadlines for the parties to complete discovery and file dispositive motions. Cooper's attorney sought to withdraw from the case, and the court granted the motion. Cooper then proceeded *pro se*.

---

[4] Airbus and Cooper consented to a magistrate judge deciding the case.

Cooper filed an amended complaint in which he asserted race discrimination and retaliation claims under Title VII and § 1981. He also brought a retaliation claim under the FMLA.[5] Airbus filed an answer to the amended complaint as well as a partial motion to dismiss, arguing that the FMLA claim was time barred. While this motion was pending, the parties engaged in discovery. Cooper never asked the court to stay discovery until the motion was decided.

The court issued a written order on the partial motion to dismiss. It explained that a two-year limitation period generally applied to FMLA claims but a three-year period applied when the employer engaged in a willful violation. Because Cooper had not alleged that Airbus knew or showed reckless disregard for whether its conduct was prohibited by the FMLA, the district court concluded that a two-year limitation period applied and the FMLA claim was untimely. Because Cooper was proceeding *pro se*, the court gave him an opportunity to file a second amended complaint to address this deficiency.

Cooper filed a second amended complaint. For the FMLA claim, he alleged that Airbus's "retaliatory actions were undertaken

---

[5] In the amended complaint, Cooper also asserted a retaliation claim under the Whistleblower Protection Act, which protects *federal employees* who engage in whistleblowing activities. *See* 5 U.S.C. §§ 2301–05. Airbus moved to dismiss this claim, arguing that Cooper had no cause of action under the statute because he was not a federal employee. The district court dismissed the claim. Because Cooper does not challenge the dismissal of this claim, we discuss it no further.

knowingly and willfully and showed reckless disregard" for whether its conduct was prohibited by the FMLA. Doc. 60 at 8. Airbus filed a second partial motion to dismiss, again arguing that the FMLA retaliation claim was time barred.

Three days after filing the second partial motion to dismiss, Airbus moved for summary judgment, arguing that Cooper had not come forward with sufficient evidence to survive summary judgment on any of his claims. For each claim, it argued that Cooper failed to establish intentional discrimination or retaliation under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Airbus asserted that it placed Cooper on the PIP and later terminated his employment for a legitimate, non-discriminatory, and non-retaliatory reason: his poor performance. It then argued that Cooper had not shown that this reason was a pretext for discrimination or retaliation. It also asserted that Cooper failed to come forward with a convincing mosaic of circumstantial evidence that supported an inference of intentional discrimination or retaliation.

To support its summary judgment motion, Airbus submitted excerpts from Cooper's deposition, declarations from several Airbus employees, including Fiton and Mattocks, and various documents. The transcript from Cooper's deposition reflected that Mattocks attended the deposition as a corporate representative. Although Cooper asked at one point during the deposition why Mattocks was present, he did not raise with the court any issue about Mattocks's presence.

Cooper opposed the summary judgment motion, arguing that he had come forward with sufficient evidence to survive summary judgment on each claim. He argued that Airbus's assertion that he was placed on the PIP and terminated for poor performance was a pretext for discrimination or retaliation. He asserted that the metrics Airbus used to assess his performance were "broad, vague, and subjective in nature" and could not be used "to evaluate his performance fairly." Doc. 73 at 21. In addition, he argued that Airbus normally trained MEs for 18 months and that his termination before the period expired "without receiving the full extent of promised and necessary training" supported an inference that the company's actions were "motivated by discriminatory and retaliatory intent." *Id.* Cooper also argued that he presented a convincing mosaic of circumstantial evidence to raise an inference of discrimination or retaliation. Along with his opposition, he submitted an affidavit and supporting documents.

Airbus moved to strike some of Cooper's evidence. It sought to exclude statements in Cooper's affidavit that, it argued, conflicted with his deposition testimony or were based solely on speculation. It also sought to strike some of Cooper's documentary evidence, including evidence about bonuses that he received while working as a corrosion specialist. Cooper opposed the motion to strike. He pointed out that Airbus had filed with the court only selected portions of his deposition transcript and asked the court to strike the "incomplete and deceptive deposition submission." Doc. 76 at 4. But he never filed a motion with the court requesting such relief.

The court issued an order granting in part and denying in part Airbus's motion to strike and granting its motion for summary judgment. The court struck several portions of Cooper's affidavit, concluding that the challenged statements were either inconsistent with his deposition testimony or "conclusory allegations" based on "conjecture without factual support." Doc. 82 at 5. The court also struck the exhibits reflecting Cooper's quarterly bonuses while working as a corrosion specialist because the evidence was not relevant to Cooper's claims. The court denied other portions of Airbus's motion to strike. For example, it refused to strike a document showing that Mattocks asked security to be on the lookout for Cooper while he was on leave, concluding it was relevant.

The court granted Airbus summary judgment on all claims. It determined that Cooper failed to satisfy his burden of producing sufficient evidence that any adverse action was due to his race or in retaliation for his protected conduct.

This is Cooper's appeal.

## II.

We review *de novo* a district court's grant of summary judgment, viewing all evidence and drawing all reasonable inferences in favor of the nonmoving party. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

16                    Opinion of the Court                    25-10378

We review for abuse of discretion a district court's decision to strike affidavit testimony on summary judgment. *Evans v. Books-A-Million*, 762 F.3d 1288, 1295 (11th Cir. 2014).

We liberally construe *pro se* litigants' pleadings, holding them "to less stringent standards than formal pleadings drafted by lawyers." *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014). We also "read briefs filed by *pro se* litigants liberally," but "issues not briefed on appeal by a *pro se* litigant are deemed abandoned." *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

### III.

On appeal, Cooper argues that the district court erred in granting summary judgment to Airbus on each of his claims because he came forward with sufficient evidence to survive summary judgment. We conclude that the district court did not err in granting summary judgment. In this section, we begin by addressing Cooper's Title VII and § 1981 claims for race discrimination and retaliation and then turn to his FMLA retaliation claim.[6]

---

[6] Before addressing the merits of Cooper's claims, we pause to address one other issue. Cooper says that the district court erred in considering his deposition testimony at the summary judgment stage because he was not given a copy of the transcript from his deposition and had no opportunity to review it and correct any errors. He relies on Federal Rule of Civil Procedure 30(e), which states that "[o]n request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days" after the transcript is available to "review" it, and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e). We see no error because there is no indication here that, before his deposition was completed, Cooper requested to review the transcript and

**A.**

Title VII of the Civil Rights Act makes it unlawful for a private employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). It also prohibits an employer from retaliating against an employee who has opposed any practice made unlawful by Title VII. *Id.* § 2000e-3(a). In addition, 42 U.S.C. § 1981 "prohibits intentional race discrimination in the making and enforcement of . . . employment contracts." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citation modified). Section 1981 also prohibits retaliation against employees who allege discrimination. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). We apply the same standards to evaluate claims under Title VII and § 1981. *See Jenkins*, 26 F.4th at 1249; *Gogel*, 967 F.3d at 1134. "To prove a claim under either statute, a plaintiff can use direct evidence, circumstantial evidence, or both." *Tynes v. Fla. Dep't of Juv. Justice*, 88 F.4th 939, 944 (11th Cir. 2023).

---

be given an opportunity to make changes. As a result, Rule 30(e) is not implicated.

Cooper also asserts that the district court erred in considering his deposition transcript because Mattocks attended his deposition as a corporate representative, which made the deposition "inherently coercive and prejudicial." Appellant's Br. 20. This issue is not properly before us because Cooper never raised it in the district court. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

As we have previously explained, when only circumstantial evidence is available, "figuring out whether the *actual* reason that an employer fired or disciplined an employee was illegal discrimination [or retaliation]" can be "difficult and elusive." *Id.* (emphasis in original) (citation modified). To address these difficulties, the Supreme Court in *McDonnell Douglas* "set out a burden shifting framework designed to draw out the necessary evidence in employment discrimination [and retaliation] cases." *Id.*

Under the *McDonnell-Douglas* framework, a plaintiff must first establish a prima facie case. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). To state a prima facie case for discrimination, a plaintiff must show that (1) he "belong[ed] to a protected class," (2) he "was subjected to an adverse employment action," (3) he "was qualified to perform the job in question," and (4) his "employer treated similarly situated employees outside [his] class more favorably." *Id.* (citation modified). To meet the "similarly situated" requirement, the plaintiff and his comparator must be similarly situated "in all material respects." *Id.* at 1226 (citation modified). To establish a prima facie case of retaliation, a plaintiff must show that (1) he "engaged in statutorily protected activity," (2) he "suffered an adverse action," and (3) "the adverse action was causally related to the protected activity." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022) (citation modified).

If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-

discriminatory or non-retaliatory reason for its employment action. *See Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant meets this burden, the plaintiff has the opportunity to show by a preponderance of the evidence that the defendant's proffered reasons "were not its true reasons, but were a pretext" for discrimination or retaliation. *Id.* at 253. The pretext inquiry "centers on the employer's beliefs," and the question is whether the employer was dissatisfied with an employee for non-discriminatory or non-retaliatory reasons, "even if mistakenly or unfairly so," or instead merely used those reasons as cover for discrimination or retaliation. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

We have explained that the *McDonnell-Douglas* framework is "an evidentiary tool that functions as a procedural device" for evaluating whether an employer acted with a discriminatory or retaliatory intent. *Tynes*, 88 F.4th at 944 (citation modified). Even when a plaintiff cannot satisfy this framework, he still may survive summary judgment by coming forward with a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination [or retaliation] by the decisionmaker." *Id.* at 946 (citation modified). We have explained that "[t]his approach to analyzing the evidence treats an employment discrimination suit in [the] same way we would treat any other case—jumping directly to the ultimate question of liability and deciding whether the moving party is entitled to judgment at that stage of the case." *Id.* at 947.

In considering whether there is a convincing mosaic, "we look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination" or retaliation. *Id.* Under this approach, a court "must consider the totality of a plaintiff's circumstantial evidence," which "may include, among other things, (1) suspicious timing or ambiguous statements, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (citation modified). At bottom, the mosaic of evidence must be enough "to allow a reasonable jury to infer but-for causation." *Id.*

We now consider whether Cooper established through circumstantial evidence[7] that Airbus engaged in intentional discrimination or retaliation when it placed him on the PIP and later terminated him. In assessing Cooper's circumstantial evidence, we

---

[7] A plaintiff also may establish an employer's discriminatory intent through direct evidence. "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (citation modified). We have explained that "only the most blatant remarks, whose intent could be nothing other than to discriminate, constitute direct evidence of discrimination." *Harris v. Pub. Health Tr. of Mia.-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023) (citation modified). In the district court, Cooper argued that he had direct evidence of discrimination, that another ME employee called him "boy." But this remark by a non-decisionmaker does not qualify as direct evidence of discrimination. *See id.* (explaining that "remarks by non-decisionmakers" are not direct evidence).

consider both the *McDonnell-Douglas* framework and whether there was a convincing mosaic of circumstantial evidence.

In applying the *McDonnell-Douglas* framework, we assume that Cooper established a prima facie case of discrimination and retaliation for his Title VII and § 1981 claims. For the retaliation claims, we assume that he engaged in protected conduct when he first contacted Mattocks because he complained of discrimination. Two months after making this report, he was placed on the PIP and about a month later he was terminated.

Despite our assumption that Cooper established a prima facie case of race discrimination and retaliation, Airbus was entitled to summary judgment. He failed to show that Airbus's legitimate reason for placing him on the PIP and later terminating him—his poor performance in the ME role—was a pretext for discrimination or retaliation.

Cooper argues that Airbus's proffered reason was a pretext for discrimination or retaliation because he showed that Airbus terminated him before he completed the 18-month training program. Although the record shows that Airbus provided new MEs with up to 18 months of training, nothing in the record supports an inference that a new ME was ***entitled*** to an 18-month training period such that Airbus could not terminate him during this period for poor performance once Airbus determined that he was not progressing. Importantly, the record shows that Airbus placed Cooper on the PIP after finding that he was not meeting expectations "concerning the basic tasks [Airbus] would expect to see" from a new

ME after spending approximately five months in the role. Doc. 63-1 at 193. And it later terminated him because he failed to meet the PIP, which identified tasks that Airbus expected a new ME to be able to complete after spending seven months in the role. Given that Airbus compared Cooper's performance to its expectations for a new ME who had spent a similar length of time in the role, the fact that Airbus terminated Cooper before he completed 18 months of training does not evidence pretext.

Cooper nevertheless argues that he established pretext because his "performance issues were minor or fabricated" and Airbus used a flawed process to evaluate his performance. Appellant's Br. 14 (citation modified). But Cooper's disagreement with Airbus's assessment of his performance does not suffice to show pretext. *See Patterson*, 38 F.4th at 1352 (explaining that a "plaintiff cannot rebut a reason by simply quarreling with the wisdom of that reason or substituting [his] business judgment for that of the employer" (citation modified)).

Cooper also argues that he introduced evidence showing that Airbus gave him positive evaluations and awarded him bonuses when he worked as a corrosion specialist. But the evidence that at an earlier time Airbus determined that Cooper successfully performed a different job with different responsibilities at a substantially lower pay rate does not demonstrate that Airbus's proffered reason for placing him on a PIP and terminating him—his poor performance as an ME—was a pretext for discrimination or retaliation. Because Cooper failed to show that the performance

issues Airbus cited were a pretext for discrimination or retaliation, he did not carry his burden under the *McDonnell-Douglas* framework.

Of course, even if Cooper failed to carry his burden under *McDonnell Douglas*, he could survive summary judgment by coming forward with a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination or retaliation. Cooper did not do so here. The record, even viewed in the light most favorable to Cooper, shows that he struggled to perform the responsibilities of the ME position, even after Airbus changed his trainer multiple times. Indeed, Cooper admitted to his coworkers that he struggled in the ME role.

We liberally construe Cooper's appellate brief as arguing that he nevertheless came forward with a convincing mosaic of evidence because he showed that he was not given the full 18 months of training, other employees shot at him with Nerf guns, Tijerina called him "boy," and Mattocks told Airbus security to be on the lookout for Cooper after the incident with Tijerina. Appellant's Br. 14. But Tijerina was not Cooper's supervisor and played no role in Airbus's decisions to place him on a PIP or later terminate him for his performance. And although Mattocks told security to be on the lookout for Cooper, he also told them that Cooper "did not do anything wrong" and that he "[m]ost likely" was going to be allowed to return to work.[8] Doc. 72-1 at 42. Given the record before

_____

[8] On appeal, Cooper says that the district court wrongly excluded his evidence about Mattocks directing security to be on the lookout for him. Although

24                    Opinion of the Court                    25-10378

us, we cannot say that a reasonable jury could infer that Cooper was placed on a PIP or terminated because of his race or in retaliation for engaging in protected conduct by complaining about discrimination.[9]

Because Cooper failed to establish that Airbus engaged in intentional race discrimination or retaliation, we conclude that the district court properly granted summary judgment to Airbus on the Title VII and § 1981 claims.

**B.**

We now turn to Cooper's FMLA retaliation claim. The FMLA entitles an eligible employee to take up to 12 weeks of leave when he has a "serious health condition that makes [him] unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D). It also guarantees that after taking leave an employee shall be "restored . . . to the position" he held before taking leave or an equivalent position. *Id.* § 2614(a)(1). "To preserve the availability of these rights, and to enforce them," the FMLA created

---

Airbus moved to strike the exhibit related to Mattocks's direction to security, the district court refused to strike it.

[9] Cooper argues that the district court's grant of summary judgment deprived him of his constitutional right to a jury trial. We see no error. It is well established that a "district court does not intrude on the constitutional role of the jury" when after "consider[ing] disputed facts in the light most favorable to the nonmoving party," it grants summary judgment. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018). Accordingly, the district court's grant of summary judgment to Airbus did not deprive Cooper of his constitutional right to a jury trial.

two types of claims: an interference claim "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA]" and a retaliation claim "in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the" FMLA. *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). In this case, Cooper raised an FMLA retaliation claim.

To establish retaliation in violation of the FMLA, an employee must show that "his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Id.* at 1207. He must show that "his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* (citation modified). To establish his employer's intent through circumstantial evidence, a plaintiff may rely on the *McDonnell-Douglas* framework or come forward with a convincing mosaic of circumstantial evidence. *See id.*; *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

We conclude that Cooper failed to carry his burden under the *McDonnell-Douglas* framework. We assume that Cooper established a prima facie case of retaliation because he introduced evidence showing that immediately upon his return from his third round of FMLA leave, he was placed on a PIP. Airbus then put forth a legitimate, non-retaliatory reason for placing him on the PIP (and later terminating him): his poor performance. We conclude, for the same reasons given in our discussion of his Title VII and § 1981

claims, that Cooper failed to show that Airbus's proffered reason was a pretext for retaliation. We also conclude, again for the same reasons, that Cooper failed to come forward with a convincing mosaic of circumstantial evidence that would allow a reasonable jury to conclude that he was placed on the PIP and later terminated because he exercised FMLA rights.

Cooper raises one additional argument unique to his FMLA retaliation claim. He says that it was improper for the district court to grant summary judgment on this claim because Airbus's motions to dismiss this claim were pending during discovery and he was "unsure" whether the claim remained in the case. Appellant's Br. 17. He states that this confusion "prevented [him] from focusing discovery" on this claim. *Id.*

The Federal Rules of Civil Procedure allow a party opposing a summary judgment motion to establish through an affidavit or declaration that he "cannot present facts essential to justify [his] opposition" to the motion and then ask the court to defer considering the motion, deny it, or give him "time to obtain affidavits or declarations or to take discovery." Fed. R. Civ. P. 56(d). We have explained that "the party opposing the motion for summary judgment bears the burden of calling to the district court's attention any outstanding discovery." *Snook v. Tr. Co. of Ga. Bank*, 859 F.2d 865, 871 (11th Cir. 1988). Here, although Cooper argues on appeal that he needed additional discovery for his FMLA retaliation claim, he never notified the district court that it should delay addressing Airbus's summary judgment motion on the claim because he needed

more discovery. Given Cooper's failure to raise any such issue with the district court, we cannot say that the district court erred when it granted summary judgment on the FMLA claim. *See id.*

## IV.

For the reasons set forth above, we affirm the district court.

**AFFIRMED.**